IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-02498-REB-MEH

GIOVANNI LARATTA,

      Plaintiff,

v.

JIM BROWN, and
SUSAN JONES,

      Defendants.

---

## RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge.**

Before the Court is Defendants' Motion for Summary Judgment [filed December 2, 2010; docket #119].  Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1C, the motion has been referred to this Court for recommendation, and the matter is now fully briefed.  Oral argument will not assist the Court in the disposition of this motion.  For the reasons that follow, the Court recommends that Defendant's motion be **granted in part and denied in part** as set forth herein.[1]

---

[1]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991); *Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1164 (10th Cir. 1986).

## BACKGROUND

### I.    Procedural History

Plaintiff, Giovanni Laratta, is a prisoner in Colorado who filed a *pro se* civil rights Complaint on October 23, 2009, alleging First, Fifth and Fourteenth Amendment violations against Defendants Zavares, Allen, Barr and Jones for confiscating and/or destroying his incoming mail.  Upon initial review, Judge Weinshienk found that Plaintiff failed to state due process claims for deprivation of his personal property.  Accordingly, Judge Weinshienk dismissed the Fifth and Fourteenth Amendment due process claims against all Defendants.  Thereafter, Judge Blackburn dismissed the remaining First Amendment claims against Zavares, Allen and Barr; dismissed a portion of the First Amendment claim against Jones[2]; and granted Plaintiff permission to add a First Amendment claim against Jim Brown.  Thus, the operative First Amended Complaint asserts claims for violation of Plaintiff's free speech rights against Jim Brown, a correctional officer at the Colorado State Penitentiary ("CSP"), and Susan Jones, Warden.  *See* docket #99.  Plaintiff seeks declaratory and injunctive relief, as well as punitive damages against Defendants.  *Id.*

### II.    Findings of Fact

The Court finds the following facts from the affidavits and unchallenged documentary evidence provided in this matter.

1.    Giovanni Laratta, CDOC # 136216, is an offender currently housed at the Colorado State Penitentiary ("CSP").  (Affidavit of Susan Jones, August 30, 2010 ("Jones Affidavit"), ¶ 4, docket #119-1.)

2.    CSP is a maximum-security/administrative segregation facility, and is the most secure and

---

[2]Judge Blackburn dismissed Plaintiff's claim against Jones regarding application of CDOC Administrative Regulation 850-6, but denied the motion to dismiss Plaintiff's claim against Jones regarding implementation of the "operational memorandum" and "implementation adjustment."

most restrictive facility within the CDOC prison system. (*Id*. at ¶ 5.)

3.      Inmates housed at CSP are administrative segregation inmates and are placed at CSP based upon inappropriate behavior while in general population or other institutions. Additionally, all offenders sentenced to the penalty of death are housed at CSP. (*Id*. at ¶ 6.)

4.      The offender population at CSP is managed with the stratified quality of life program, as set forth in Operational Memorandum ("OM") 650-100, based on increased levels of privileges for demonstrated appropriate offender behavior and program compliance. (*Id*. at ¶ 7; *see also* docket #119-1 at 7.)

5.      This stratified, incentive based program based on behavior and program participation consists of levels one through six. (OM 650-100(IV)(F) & (G), docket #119-1 at 9-13.)

6.      OM 650-100 provides a detailed description of the privileges provided to offenders at each level. (*Id*.)

7.      Offenders will be evaluated for documented appropriate behavior and program compliance. (Jones Affidavit, ¶ 14.)

8.      Levels Four, Five, and Six consist of the Progressive Reintegration Opportunity Program ("PRO"). (OM 650-100(IV)(G), docket #119-1 at 12-13.)  The PRO Program is a specialized program that is designed to transition offenders from administrative segregation to general population. (Jones Affidavit, ¶ 19.)

9.      Offender property is governed by CDOC Administrative Regulation (AR) 850-06.  (Docket #119-1 at 33.)

10.     AR 850-06(IV)(D) provides that "[a]fter initial processing, offenders will be permitted to acquire authorized personal property, through approved sources of supply and the CDOC Canteen, as long as the increase of property does not violate the personal property limitations."  (*Id*. at 36.)

11.     AR 850-06(IV)(D)(1)(b) further provides that "[t]he Canteen will be the sole source for all

personal property items with the exception of books, magazines, legal papers, hobby craft items, health care items, and faith items as outlined in AR 800-01, *Religious Programs, Services, Clergy, Faith Group Representatives and Practices....*" (*Id.* (emphasis in original text).)

12.     Property received by offenders through the mail must comply with the procedures in AR 300-38, which governs offender mail.  (Jones Affidavit, ¶ 28; *see also* AR 300-38, docket #119-1 at 47.)

13.     Offender mail at the CSP is governed by AR 300-38 and Implementation Adjustment ("IA") 300-38. (Jones Affidavit, ¶ 29; *see also* IA 300-38, docket #119-1 at 65.)

14.     AR 300-38(IV)(B)(8)(a) provides that "[a]ll censorable or rejected reading material shall be forwarded to the facility reading committee and disposed of pursuant to AR 300-26, Offender Reading Material."  (Affidavit of Jim Brown, December 2, 2010 ("Brown Affidavit"), ¶ 9; docket #119-2; *see also* AR 300-38(IV)(B)(8)(a), docket #119-2 at 26.)

15.     If a piece of mail is rejected it "may be returned to the sender at the expense of the offender or disposed of at the discretion of DOC employees. The offender shall receive a written notification of the rejection utilizing the 'Notice of Rejection/Disposition of Mail' (Attachment "D") within ten days of receipt of the item by DOC mailroom employees." (*Id.*)

16.     If appropriate, "[r]eading materials shall be referred to the facility reading committee for review in accordance with AR 300-26..." (AR 300-38(IV)(B)(8)(c), docket #119-2 at 26.)

17.     AR 300-26(IV)(A)(2) provides that "[r]eading material processed via the mailroom, pursuant to AR 300-38, Offender Mail, either incoming or outgoing, may be opened and inspected for contraband. ... Incoming or outgoing non-restricted inspection mail may be read for content and forwarded to the facility reading committee pursuant to the review criteria set forth in AR 300-26, IV.B.2.a-f." (Brown Affidavit, ¶ 12).

18.     On or around December 10, 2008, photographs were received by the CSP mailroom that were intended to be sent to the Plaintiff.  (*Id.* at ¶ 14.)

4

19.     Sam Laratta, Plaintiff's father, attests that on or about December 7, 2008, he placed an envelope full of forty (40) photographs in the United States mail addressed to his son, the Plaintiff, at the CSP.  (Affidavit of Sam Laratta, January 7, 2011, ("Laratta Affidavit"), docket #126 at 34.)

20.     It was deemed at CSP that these photographs should be reviewed by the facility's reading committee as provided in AR 300-26(IV)(A)(2). (Brown Affidavit, ¶ 15; *see also* Notice of Rejection/Disposition of Mail, December 10, 2008, docket #119-2 at 56.)

21.     The photographs were supposed to be sent to the reading committee; however, due to an oversight, the photographs were not sent to the reading committee and were then inadvertently destroyed. (Brown Affidavit, ¶ 16.)

22.     Laratta filed a Step 1 grievance, in part, regarding the inadvertent destruction of these photographs and the denial of the calendar. (CDOC Offender Grievance Form, February 26, 2009, docket #119-2 at 57.)

23.     Lieutenant Barr responded to Laratta's Step 1 grievance.  (*Id.*)

24.     Laratta subsequently filed a Step 2 and a Step 3 grievance regarding the destruction of his photographs. (Brown Affidavit, ¶ 19.)   The Step 3 grievance officer investigated Laratta's complaints and determined that Mr. Laratta "received 8 commercial photographs through the Mail Room at CSP." (Recommendation to Grant Relief, July 9, 2009, docket #119-2 at 58.)  The officer determined, "the photos were confiscated, placed in the Contraband Room and subsequently destroyed.  Per AR 300-38 Offender Mail, Offender Laratta should have been afforded the opportunity to determine their disposition before destruction of the photos occurred. Offender Laratta is entitled to reimbursement for the destroyed photographs." (*Id.*)

25.     Relief was granted to Mr. Laratta by the Executive Director. (Brown Affidavit, ¶ 20.)

26.     On July 16, 2009, the Step 3 Grievance Officer sent a memorandum to Susan Jones, the Warden at CSP and the Centennial Correctional Facility, indicating that the Executive Director has

granted Mr. Laratta's grievance. (Memorandum from Anthony DeCesaro, July 16, 2009, docket #119-2 at 59.)

27.     The memorandum indicates that the "[c]ommericial photos from this company retail at $1.00 each. Reimbursement to the Offender's inmate Banking Account totals $8.00." (*Id*.)

28.     On July 30, 2009, the Step 3 Grievance Officer issued his response to Laratta's Step 3 grievance, #CS08/09-0838, stating that relief has been granted. (Letter from Anthony DeCesaro, July 30, 2009, docket #119-3 at 60.)

29.     On July 22, 2009, Laratta's inmate banking account was credited with an $8.00 deposit. (Inmate Banking History for Giovanni Laratta, docket #119-2 at 61.)

30.     On or about February 17, 2009, a utility calendar was received by the CSP mailroom for Laratta. (Notice of Rejection/Disposition of Mail, February 17, 2009, docket #119-2 at 62.)

31.     Within the CDOC, calendars are considered to be personal property and are subject to the restrictions set forth in AR 850-06. (Jones Affidavit, ¶ 30.)

32.     AR 850-06(IV)(D)(1)(b) states in pertinent part, "[t]he Canteen will be the sole source for all personal property items with the exception of books, magazines, legal papers, hobby craft items, health care items, and faith items as outlined in AR800-01." (Docket #119-2 at 10.)  Pursuant to this section, the calendar received by Laratta was deemed to be contraband. (Brown Affidavit, ¶ 26.)

33.     The CDOC Administrative Regulations do not allow offenders to acquire and possess calendars from a source other than from the Canteen. (Jones Affidavit, ¶ 31.)  This restriction is not based upon the content of the calendar but applies to all calendars except for the calendar offered through the Canteen. (*Id.*, ¶ 32.)

34.     Therefore, on February 17, 2009, a Notice of Rejection/Disposition of Mail was issued to Laratta indicating that the calendar was declared to be contraband and Laratta would have to designate proper disposition for the calendar within ten days or the calendar would be disposed of

pursuant to regulation. (Notice of Rejection/Disposition of Mail, February 17, 2009, docket #119-2 at 62.)

35.     On February 23, 2009, Laratta executed the designation of disposition for the calendar requesting that the calendar be sent to "Salvetti Laratta" at a Wheatridge, Colorado address.  (Docket #126 at 22.)  Laratta attached a Misc. Withdrawal Ticket, dated February 23, 2009, for "postage." (*Id.* at 23.)

36.     Laratta attests that Brown returned these documents to him on March 3, 2009 indicating that the calendar had been destroyed that day.  (Declaration of Giovanni Laratta, January 3, 2011 ("Laratta Declaration"), ¶ 16, docket #126 at 19.)

37.     Brown attests that Laratta failed to properly inform mailroom staff of the desired disposition of the calendar within the ten-day time limit. (Brown Affidavit, ¶ 28).  Thus, the calendar was destroyed on March 3, 2009. (*Id*. at ¶ 29).

38.     Offenders housed at CSP are not permitted to belong to any academic/educational correspondence courses. (Implementation Adjustment ("IA") 300-38(IV)(E)(7)(a), docket #119-1 at 69-70.)

39.     Additionally, offenders housed at CSP are not permitted to receive any academic/educational correspondence courses through the mail. (IA 300-38(IV)(E)(7)(b).)

40.     The restriction against receiving any academic/educational correspondence courses through the mail are due to the nature of CSP and are based on the Quality of Life program that is aimed at changing offender behavior to prepare the offender to be returned to a general population prison setting. (Jones Affidavit, ¶ 35.)

41.     Once offenders progress out of CSP, the offenders have the ability to participate in correspondence courses in many of the general population facilities. (*Id*., ¶ 36.)

## LEGAL STANDARDS

### I.      Fed. R. Civ. P. 56

Summary judgment serves the purpose of testing whether a trial is required.  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).   The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).   However, the non-moving party has the burden of showing that there are issues of material fact to be determined.  *Id.* at 324.

That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).   "[T]he content of summary judgment evidence must be

generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## II.       Treatment of a Pro Se Plaintiff's Pleadings

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted). In other words, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)).

## <u>ANALYSIS</u>

## I.       Qualified Immunity

The Defendants assert they are entitled to qualified immunity on Plaintiff's claims against them in their individual capacities. Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an entitlement not to stand trial or face the other burdens of litigation. *Ahmad v. Furlong,* 435 F.3d 1196, 1198 (10th Cir.

2006) (internal quotations and citations omitted). The privilege is an immunity from suit rather than a mere defense to liability. *Id.* When a defendant asserts the defense of qualified immunity at summary judgment, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)).

The Supreme Court recently discarded a review process that required courts to examine these questions sequentially, first considering whether a right had been violated, and then second - if the court concluded a right had been violated - whether that right was clearly established at the time of the alleged violation. *Pearson,* 129 S. Ct. at 816-22. *Pearson* retired this process, instead affording courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

Here, in determining whether Plaintiff has met his burden of demonstrating constitutional violations that were clearly established, the Court construes the facts in the light most favorable to him as the non-moving party. *Scott*, 550 U.S. at 378. At summary judgment, the litigation is beyond the pleading phase; thus, a plaintiff's version of the facts must be supported by the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). That is, "as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Id.* (citations and quotations omitted).

Consequently, for each claim alleged, the Court will examine first whether the Plaintiff has demonstrated on supported facts that each of the Defendants violated his constitutional rights under

the First Amendment.  If the Plaintiff has established sufficient facts to support a constitutional violation, the Court will then proceed to determine whether the right was clearly established at the time of the alleged conduct.

### A.      Jim Brown

Plaintiff claims that Correctional Officer, Jim Brown, improperly rejected and destroyed two mailings sent to the Plaintiff at the CSP: the first containing photographs sent by his father and the second containing a calendar sent by a publishing company.

### 1.      Photographs

Correspondence between a prisoner and an outsider implicates the guarantee of freedom of speech under the First Amendment. *Treff v. Galetka*, 74 F.3d 191, 194 (10th Cir. 1996).  "Prisoners' First Amendment rights encompass the right to be free from certain interference with mail correspondence, including photographs."  *Davis v. Norris*, 249 F.3d 800, 801 (8th Cir. 2001) (citations omitted).

Here, Plaintiff claims that Defendant Brown violated the First Amendment by intercepting an envelope containing photographs mailed to him by his father, and allowing the photographs to be destroyed without notifying Plaintiff and permitting him to designate the photographs' disposition.  Plaintiff furnishes an affidavit by Sam Laratta attesting that on or about December 7, 2008, Mr. Laratta mailed to the Plaintiff "an envelope full of (40) photographs."  Laratta Affidavit, docket #126 at 34.  Brown counters that the photographs, commercial in nature and determined to be contraband, were inadvertently destroyed without being censored by the reading committee, and Plaintiff was subsequently reimbursed the cost of the photos in the amount of $8.00 ($1.00 per photograph).  Thus, Brown contends the First Amendment is not implicated.

The "Notice of Rejection/Disposition of Mail" dated December 10, 2008 reflects that "photos" sent to Plaintiff from "S Laratta" were either "rejected" or "declared contraband" (no stated

reason) and "sent to reading committee." *See* docket #119-2 at 56.  The notice was signed by a Mail Officer, presumably Jim Brown (undisputed by the parties).  *Id.*  The notice is stamped "destroyed" on January 15, 2009.  *Id.*  Brown attests, "[t]he photographs were supposed to be sent to the reading committee, however, due to an oversight, the photographs were not sent to the reading committee and were then inadvertently destroyed."  Brown Affidavit, ¶ 16, docket #119-2 at 3.

Plaintiff contends that Brown admits responsibility for the re-routing and destruction of his photographs, and, thus, Brown is liable for a First Amendment violation.  Plaintiff cites this Court's finding on his Motion to Amend Complaint (affirmed by the District Court) for the proposition that, because his allegations that "Brown rejected delivery of the photographs and calendar and, thereafter, caused them to be destroyed" stated plausible First Amendment claims under a Fed. R. Civ. P. 12(b)(6) analysis, such finding is sufficient to impose liability against Brown.  *See* docket #126 at 4.  However, at this stage of the litigation, the Plaintiff is wrong.

To survive summary judgment in the qualified immunity context, it is the plaintiff's burden to demonstrate on supported facts a genuine issue as to whether the defendant committed a constitutional violation.  To prove a First Amendment violation, the plaintiff must show that the defendant intentionally confiscated and destroyed his mail.  *See Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010) (inmate's allegation that prison official intentionally confiscated and destroyed letters for the purpose of harassing him sufficiently pled First Amendment violation); *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990) (an isolated incident of opening and inspecting mail without evidence of improper motive does not give rise to a constitutional violation); *Bowens v. United States Dep't of Justice*, No. 10-3678, 2011 WL 229490, at *4 (3d Cir. Jan. 26, 2011) (finding no material evidence in the record that the mail screening officer tampered with plaintiff's mail or otherwise acted in an unconstitutional fashion); *see also Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (finding that an isolated act of negligence does not violate an

inmate's First Amendment right to free exercise of religion).

Plaintiff makes no argument nor offers any facts demonstrating that Brown *intentionally* rejected the photographs on December 10, 2008, then subsequently had them destroyed.  Plaintiff claims that, after he filed his February 26, 2009 grievance regarding the photos and calendar, and during the Step 3 process in July 2009 (*see* docket #119-2 at 58), Brown "lied" to the grievance officer about the number of photographs received in the envelope, thus demonstrating Brown's "deliberate indifference" to Plaintiff's First Amendment rights.  Laratta Declaration, ¶ 14, docket #126 at 19.  Even if true that the envelope contained forty (40) photographs rather than eight (8), Brown's subsequent mischaracterization of the *number* of photographs (if proven that he provided such information to the grievance officer) relates in no way to whether Brown intentionally rejected and/or destroyed the photographs in the first place.

Because the Plaintiff has failed to demonstrate a First Amendment violation with respect to the photographs, the Court recommends that the District Court find Brown is entitled to qualified immunity and grant Defendants' motion for summary judgment on Plaintiff's First Amendment claim against Brown concerning the photographs.

### 2.    Calendar

Plaintiff also claims that Brown improperly rejected and destroyed a calendar mailed to him by a company called, Unity Calendars.  He contends that he received the February 17, 2009 "Notice of Rejection/Disposition of Mail" concerning the calendar and timely returned the notice on February 23, 2009 requesting that the calendar be mailed to his father at Plaintiff's expense.  *See* Plaintiff's Exhibit A-1, docket #126 at 22.  Brown responds that the calendar was properly rejected as contraband pursuant to the facility's personal property regulation and, when the Plaintiff did not respond to the notice of disposition within the ten-day limit, the calendar was destroyed on March 3, 2009.  Brown Affidavit, ¶¶ 27-29, docket #119-2 at 5.  Further, Brown argues that, even if true

that the calendar was improperly destroyed, such action does not constitute a First Amendment violation.

First, the Court agrees with Brown that his rejection of the calendar as contraband does not implicate the First Amendment.  Offender property is governed by CDOC Administrative Regulation (AR) 850-06.[3]  AR 850-06(IV)(D) provides that "[a]fter initial processing, offenders will be permitted to acquire authorized personal property, through approved sources of supply and the CDOC Canteen, as long as the increase of property does not violate the personal property limitations."  AR 850-06(IV)(D)(1)(b) further provides that "[t]he Canteen will be the sole source for all personal property items with the exception of books, magazines, legal papers, hobby craft items, health care items, and faith items as outlined in AR 800-01, *Religious Programs, Services, Clergy, Faith Group Representatives and Practices*."  (Emphasis in original text.)  In addition, Warden Jones attests that, within the CDOC, calendars are considered to be personal property and may not be purchased from source other than from the Canteen.  Affidavit of Susan Jones, August 30, 2010 ("Jones Affidavit"), ¶¶ 30-31, docket #119-1.  Brown simply and properly followed the regulation and prison policy when he rejected the calendar as contraband and refused to deliver it to the Plaintiff.  *See Bowens*, 2011 WL 229490, at *4.

However, the Court recommends finding that Plaintiff has demonstrated on supported facts that Brown may have intentionally interfered with Plaintiff's mail by destroying the calendar despite Plaintiff's request to forward the mailing to his father at his expense.  The February 17, 2009 Notice of Rejection/Disposition of Mail reflects that a "calendar" mailed to Plaintiff from "Unity Calendars" was "declared contraband" and "the offender must designate disposition within 10 days

_____

[3]Plaintiff attempts to distinguish the calendar as a "publication" as opposed to "property." However, while the CDOC provides a specific regulation for "reading materials," the regulation does not identify a calendar as reading material and the Court does not consider it to be so.  *See* AR 300-26(III)(H), docket #119-2 at 37.

or the item will be disposed of." Docket #119-2 at 62.  Plaintiff attests that on February 23, 2009,

he returned the notice with instructions to mail the calendar to his father.  Laratta Declaration, ¶15,

docket #126 at 19.  Plaintiff attaches copies of the notice executed by him on February 23, 2009

designating disposition as "send to the following address" and a mailing label reflecting his return

address and a ship-to address for "Salvetti Laratta," along with an executed "Misc. Withdrawal

Ticket" dated February 23, 2009 for "postage."[4]  By permitting the Plaintiff to designate the

disposition of the calendar, Brown gave the Plaintiff "control" over what was to happen next to the

mailing (at least, for the following ten days).  This evidence raises a question of fact as to whether

Brown destroyed the calendar on March 3, 2009 knowing that Plaintiff had requested (after being

permitted to do so) the calendar be mailed to his father.

        Brown concedes that this evidence raises a disputed fact as to whether the calendar was

improperly destroyed, but contends that Plaintiff's claim for the destruction of the calendar simply

amounts to a due process/deprivation of property claim.  Docket #128 at 7.  The Court disagrees and

finds that the calendar, in fact, was not Plaintiff's personal property after it was denied him as

prohibited contraband.  Rather, the calendar was, for purposes of this analysis, simply the contents

of a mailing that Plaintiff asked to be sent to his father at the Plaintiff's expense.  There is no

indication nor argument that the calendar constituted improper or unsafe "outgoing" mail.  *See* AR

300-38(IV)(A)(2) ("[w]hen the offender bears the mailing cost, there is no limit on the volume of

letters the offender can send or receive or on the length, language, content or source of mail or

publications except when there is reasonable belief that limitation is necessary to protect public

safety or institutional order and security."), docket #119-2 at 23.

---

[4]The Court notes a possible inconsistency between this request to mail the calendar to his Plaintiff's father and Plaintiff's request three days later in his February 26, 2009 grievance: "[t]he specific remedy I am requesting is to receive the above stated photos and calendar."  Docket #119-2 at 57.  However, such inconsistency, if it exists, may not be resolved on summary judgment.

Furthermore, Plaintiff's right to be free from interference with his outgoing mail was clearly established in December 2008. *See Treff*, 74 F.3d at 195 ("we hold that a prisoner's constitutional right to have his mail processed for delivery was clearly established at the time [plaintiff's] mail was allegedly not processed.").

Accordingly, the Court recommends that the District Court deny Defendants' motion for summary judgment with respect to Plaintiff's First Amendment claim against Defendant Brown concerning the calendar.

B.      Susan Jones

Plaintiff alleges that Defendant Susan Jones, CCCF/CSP Warden, implemented and applied Operational Memorandum ("OM") 650-100 and Implementation Adjustment ("IA") 300-38 to deny Plaintiff receipt of a paralegal correspondence course by mail in violation of his First Amendment rights.

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)).  In situations where an "affirmative link" exists between the constitutional deprivation and either the supervisor's personal participation, her exercise of control or direction, or her failure to supervise, the supervisor may be personally liable.  *Id.* (citing *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993)).  The establishment or utilization of an unconstitutional policy or custom can serve as the supervisor's "affirmative link" to the constitutional violation.  *Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1263 (D. Colo. 2010) (citing *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988)).  "Therefore, where an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application." *Id.*; *see also Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) ("[a] supervisory

16

official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue") (citations omitted).

"Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (citations omitted).  However, the First Amendment right to retain newspapers, magazines, and other publications can be reasonably restricted so that the right is considerably less for inmates in disciplinary segregation than the rights of inmates in the general population.  *See Beard v. Banks,* 548 U.S. 521, 528-29 (2006) ("[T]he Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere.").  An inmate retains only those "First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Incarceration requires that "many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); *see also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, (1987).  Prison officials are allowed to impose "curtailment[s] of that freedom." *Overton,* 539 U.S. at 131. Those curtailments are valid provided the regulation bears a "rational relationship to legitimate penological interests." *Id.* at 132 (citing *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

In making this determination, a district court typically must analyze the challenged regulation under the four-part test established by the Supreme Court in *Turner. Jacklovich*, 392 F.3d at 426.  The analysis requires an examination of the following factors: "(1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest; (2) whether alternative means of exercising the constitutional right remain available to inmates; (3) any effect accommodating the right would have on guards, inmates, and the allocation of prison resources; and (4) the absence of ready alternatives." *Id.*; *Jones v. Salt Lake County,* 503 F.3d 1147,

1153-54 (10th Cir. 2007).

However, where, as here, the regulation governs privileges granted to and withheld from high security prisoners, the Supreme Court has "modified" the four-factor *Turner* analysis stating, "[t]he real task in this case is not balancing [the *Turner*] factors, but rather determining whether the Secretary shows more than simply a logical relation [between the regulation and the governmental interest]; that is, whether he shows a *reasonable* relation." *Beard*, 548 U.S. at 533 (emphasis in original). In finding the government's justification of "'motivating better behavior' on the part of 'particularly difficult prisoners'" for its regulation denying newspapers, magazines and photographs to satisfy *Turner*, the Court determined that the second, third and fourth factors added little, one way or the other, to the first factor's basic logical rationale. *Id.* at 532.

Likewise, in this case, the Court will focus on *Turner*'s first factor to determine whether OM650-100 and/or AR300-38 violate Plaintiff's First Amendment rights. The burden to prove the validity of prison regulations is not on the State but on the prisoner to disprove it. *Overton*, 539 U.S. at 132.

With respect to the first *Turner* factor, the court must determine whether the government's objective underlying the regulation is legitimate and neutral, and whether the regulation is rationally related to that objective. *Thornburgh*, 490 U.S. at 414. "To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned materials actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (citing *Thornburgh,* 490 U.S. at 417 and *Casey v. Lewis,* 4 F.3d 1516, 1521 (9th Cir. 1993)). Moreover, it does not matter whether the court agrees with the government or whether the policy, in fact, advances the prison's legitimate interests. *See Amatel v. Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998). Rather, the issue is whether the government's judgment was "rational"; that is, whether the government might have reasonably

thought that the policy would advance its interests.  *See id.*

Furthermore, as set forth above, the Court must analyze whether the connection between the regulation and the government's objective is "reasonable."  *Beard*, 548 U.S. at 533.

In addition, the governmental objective must be neutral.  *Jones*, 503 F.3d at 1153.  "A regulation restricting an inmate's first Amendment rights must operate without regard to the content of the expression. ... Where a regulation furthers an important or substantial government interest unrelated to the suppression of expression, the neutrality requirement is met."  *Id.*

The Plaintiff is an offender currently housed, and was housed at all times relevant to the First Amended Complaint, at the Colorado State Penitentiary ("CSP").  Warden Jones testifies that the CSP is a maximum-security/administrative segregation facility, and is the most secure and most restrictive facility within the CDOC prison system. Jones Affidavit, ¶ 5, docket #119-1.  Inmates housed at CSP are administrative segregation inmates and are placed at CSP based upon inappropriate behavior while in general population or other institutions.  *Id.*, ¶ 6.  Additionally, all offenders sentenced to the penalty of death are housed at CSP.  *Id.*

The offender population at CSP is managed with the stratified Quality of Life program, as set forth in OM 650-100, based upon increased levels of privileges for demonstrated appropriate offender behavior and program compliance.  *See* docket #119-1 at 7-16.  OM 650-100(IV)(F) & (G) provide a detailed description of the privileges provided to offenders at each level of the program.  *Id.* at 9-13.  For offenders to be considered for progression to a general population facility, offenders must successfully complete all six levels and a minimum of approximately fifty-six (56) weeks in the program.  *Id.*

None of the offenders housed at CSP are permitted to belong to any academic/educational correspondence courses, nor are they permitted to receive any academic/educational correspondence courses through the mail.  OM 650-100(IV)(F) & (G); *see also* IA 300-38(IV)(E)(7), docket 119-1 at

69-70.   Warden Jones testifies that the restriction against receiving any academic/educational correspondence courses through the mail is due to the nature of the CSP as a high-security restrictive facility and based upon the Quality of Life program that is aimed at changing offender behavior to prepare the offender to be returned to a general population prison setting.   Jones Affidavit, ¶ 35. According to Jones, once offenders progress out of CSP, the offenders have the ability to participate in correspondence courses in many of the general population facilities.   *Id.*, ¶ 36.

Jones contends that, if IA 300-38 were changed to accommodate the offenders by allowing offenders to receive academic/education correspondence courses in the mail, such change would have a negative impact upon the correctional and management goals associated with the Quality of Life program.   *Id.*, ¶ 37.   Jones states that permitting the offenders to have this privilege would undermine the goal of attempting to produce better behavior from the offender through the Quality of Life program.   *Id.*, ¶ 38.

Plaintiff counters that Defendants rejected the paralegal correspondence course twice - first, when it was mailed by the publisher and second, when it was photocopied and mailed by his father. Docket #126 at 6. Plaintiff contends that the challenged regulation concerning "participation in a correspondence course" does not apply to the second mailing and, thus, the *Turner* analysis is not applicable.   *Id.*  In the alternative, Plaintiff claims that the *Turner* factors weigh in his favor.   For example, Plaintiff asserts that, under the first factor, the goal should be to prepare Plaintiff for release to society (rather than to general population), since the Quality of Life program operates improperly to keep him in segregation until his release date.[5]  *Id.* at 7, 8.   Plaintiff also notes the "positive correlation between increased education and lowered recidivism rates."  *Id.* at 8.   In

---

[5]Plaintiff's arguments concerning his "inability" to progress from Level Three of the Quality of Life program are irrelevant in this case.  Plaintiff's only claim concerning OM 650-100 and IA 300-38 relate to Defendants' rejection of the paralegal correspondence course through the prison mail in December 2008 allegedly in violation of Plaintiff's First Amendment rights.  *See* First Amended Complaint, docket #99.

addition, Plaintiff argues that modification of behavior is not a legitimate goal as is the protection of a "direct threat of the order and security of the prison." *Id.* at 7.

First, the Court finds unpersuasive Plaintiff's argument concerning the inapplicability of *Turner* to the second mailing. Defendants rely on both IA 300-38(IV)(E)(7)(a) (offenders not allowed to belong to academic/educational correspondence courses) and (b) (offenders not allowed to receive academic/educational correspondence courses through the mail) for rejection of the paralegal course sent to Plaintiff through the mail. Clearly, the regulations govern both the first mailing of the course from the publisher and the second mailing from Plaintiff's father. Thus, the Court sees no need to "separate" the two "scenarios" for purposes of a *Turner* analysis.

Second, the Court rejects Plaintiff's argument concerning the legitimacy of Defendants' stated goal for the regulation and finds that behavior modification is a legitimate penological goal, particularly concerning prisoners in segregation. *See Beard*, 548 U.S. at 531-32.

Third, the Court recommends finding that Defendants' restriction of academic/educational courses is rationally and reasonably related to the prison's legitimate goal of behavior modification. The Court looks specifically to the analysis in *Beard* in which the Supreme Court applied the *Turner* factors to a regulation restricting certain privileges to inmates housed in a high security segregation facility, much like the CSP in this case. Again, *Beard* confirms that a court need only analyze the regulation under a "heightened" *Turner* first factor, since the other three factors "add little" to an analysis of whether the regulation meets the reasonable relationship test.[6] *Beard*, 548 U.S. at 532.

---

[6]That is, a regulation aimed at improving behavior of "difficult prisoners" that deprives an inmate of a privilege, by design, does not provide an alternative means for the inmate to exercise the deprived right (second factor). Moreover, when the penological objective encourages good behavior or forces the inmate to face losing privileges in segregation, it makes little sense to inquire into "the impact accommodation of the asserted constitutional right will have on guards and other inmates" (third factor), or the allocation of prison resources generally or the availability of "ready alternatives" (fourth factor), because it is inherent that accommodating the privilege and providing ready alternatives would likely produce worse behavior. *See Wickner v. Symmes*, No. 09-940, 2010 WL 3385101, at *4 (D. Minn. July 22, 2010).

The stated purpose for the Quality of Life program set forth in OM 650-100 is to "govern[ ] the operational procedures relevant to the high security offender management, security, behavioral expectations and specialized programmatic needs of offenders assigned."   Docket #119-1 at 7. Likewise, through IA 300-38, the CSP has accepted and implemented the provisions of AR 300-38 concerning offender mail "with the following procedures to accomplish the intent of the AR." *Id.* at 65.  Such procedures, including IA 300-38(IV)(E)(7) concerning prohibition of academic/educational courses, are clearly modified to reflect stricter standards for the segregated inmates of the CSP.  *Id.* at 69-70.  Such modifications are generally accepted without violating the First Amendment. *See Beard,* 548 U.S. at 528-29 ("the First Amendment right to retain newspapers, magazines, and other publications can be reasonably restricted so that the right is considerably less for inmates in disciplinary segregation than the rights of inmates in the general population.").

Warden Jones, who put into effect IA 300-38 and OM 650-100, attests that the regulation prohibiting academic/educational correspondence courses for segregated offenders is "aimed at changing offender behavior to prepare the offender to be returned to a general population prison setting," since offenders who progress out of the CSP "have the ability to participate in correspondence courses in many of the general population facilities."  Jones Affidavit, ¶¶ 35, 36. Jones warns that, "[p]ermitting the offenders to have this privilege would undermine the goal of attempting to produce better behavior from the offender through the Quality of Life program." *Id.*, ¶ 38.

Plaintiff makes no argument concerning the behavior modification justification, except to conclude improperly that it is not a legitimate goal.  The Court believes that the regulation prohibiting CSP inmates' participation in or receipt by mail of academic correspondence courses not only serves the legitimate purpose of attempting to modify the behavior of segregated inmates (that is, encouraging them to progress into general population), but also serves as a deterrence to

inmates in the general population to avoid violent, abusive or otherwise improper behavior that might result in disciplinary segregation and/or placement at the CSP. The regulation itself is content neutral[7] and applies to all inmates at the CSP; thus, the regulation furthers its goal without suppression of specific expression. *See Jones*, 503 F.3d at 1153. Considering the important values attached to an individual's First Amendment right to access publications through the mail, as well as the considerable deference owed to prison administrators' decisions concerning the facility's security and control, this Court recommends that the District Court find IA 300-38 rationally and reasonably related to the legitimate penological goals of behavior modification (through OM 650-100), deterrence and security.

Furthermore, to the extent that Plaintiff's claim against Warden Jones may be construed as a complaint that the regulation was unconstitutionally applied to him, the Court perceives no First Amendment violation. Plaintiff alleges that the "same paralegal course [is] accepted and allowed for offender reception in the general prison population of the Colorado Department of Corrections." Docket #99 at 6. As set forth herein, the Court has concluded that the regulation, applying only to inmates at the CSP, is reasonably related to a legitimate penological goal. Plaintiff alleges no other "discriminatory," "retaliatory" nor other improper conduct by the Defendants that may give rise to a constitutional violation.

As such, the Court recommends that the District Court find Warden Jones is entitled to qualified immunity as to Plaintiff's First Amendment claim concerning the paralegal correspondence course, and grant Defendants' motion.

## II.     Punitive Damages

---

[7]The regulation does except religious courses for inmates at the highest level of the program, but the Plaintiff makes no claim nor argument concerning the exception.

Defendants seek summary judgment on Plaintiff's claim for punitive damages in this case. Punitive damages are appropriate in an action under § 1983 only if the challenged conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001), *cert. denied*, 536 U.S. 904 (2002) (internal quotation marks omitted). Punitive damages are therefore available only if the violator knew or recklessly disregarded whether his conduct was prohibited by federal law. *See Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989).

Additionally, Punitive damages are appropriate when a compensatory (or in this case, a nominal) award is insufficient to deter and punish defendants from similar conduct in the future. *Youren v. Tintic Sch. Dist.,* 343 F.3d 1296, 1308 (10th Cir. 2003) (quotation omitted). "Punitive damages serve a broader function than compensatory [or nominal] damages; they are aimed at deterrence and retribution." *Id.* (quotations and brackets in original omitted).

Here, this Court has found that genuine issues of material fact exist as to whether Defendant Brown intentionally destroyed the mailed calendar allegedly after being notified that Plaintiff wished to mail the calendar to his father at his own expense. The Plaintiff's right to be free from improper interference with outgoing mail was clearly established at the time of the alleged incident. Thus, the Court cannot conclude that insufficient evidence exists demonstrating Brown acted with reckless disregard as to Plaintiff's First Amendment right.

Defendants argue that, because Plaintiff sought neither compensatory nor nominal damages in his Amended Complaint, no punitive damages may be awarded since an award is dependent on the underlying claim. However, a plaintiff need not necessarily request an award of nominal damages to receive them upon prevailing at trial. *See Larson v. Meek*, 240 F. App'x 777, 781 n.2 (10th Cir. 2007) ("even if [plaintiff] cannot recover compensatory or punitive damages, he may still be entitled to pursue his action and receive an award of nominal damages.") (citing *Searles*, 251 F.3d

at 878-79); *see also Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003) (where inmate did not specifically request nominal damages in his complaint, court still concluded "a plaintiff who proves a constitutional violation is entitled to nominal damages").

Therefore, the Court recommends that the District Court deny Defendants' motion seeking summary judgment on Plaintiff's punitive damages claim against Defendant Brown for interference and destruction of the calendar.  Because the Court recommends dismissal of Plaintiff's other claims against Brown and Jones, the Court also recommends that the District Court grant the motion with respect to punitive damages as to these claims.

## CONCLUSION

Based upon the foregoing, this Court respectfully RECOMMENDS that the Defendants' Motion for Summary Judgment [filed December 2, 2010; docket #119] be **GRANTED IN PART AND DENIED IN PART** as follows:

1. Grant Defendants' motion finding Defendant Jim Brown is entitled to qualified immunity on Plaintiff's First Amendment claim concerning the photographs;

2. Grant Defendants' motion finding Defendant Susan Jones is entitled to qualified immunity on Plaintiff's First Amendment claim concerning the paralegal correspondence course;

3. Deny Defendants' motion finding Brown is not entitled to qualified immunity on Plaintiff's First Amendment claim concerning the calendar; and

4. Deny Defendants' motion seeking summary judgment on Plaintiff's claim for punitive damages against Brown for interference with and destruction fo the calendar.

Dated this 2nd day of March, 2011, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge